# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| **DWAIN STANFORD, SHARON STANFORD,** | : | |
| **JOHN DOE, and JANE DOE** | : | |
| **PLAINTIFFS,** | : | |
| **v.** | : | |
| **NORTHMONT CITY SCHOOL DISTRICT,** | : | CIVIL COMPLAINT AND |
| **and** | : | JURY DEMAND |
| **JAMES CHAD KALTENBACH in his official** | : | |
| **capacity of Vice Principal at Northmont City** | : | |
| **Schools; and** | : | |
| **TONY THOMAS in his official capacity of** | : | |
| **Superintendent of Northmont City Schools; and** | : | |
| **LINDA BLUM in her official capacity as** | : | |
| **Northmont City Schools School Board** | : | |
| **President; and** | : | |
| **MICHAEL W. BARRON in his official capacity** | : | |
| **as Northmont City Schools Medical Consultant,** | : | |
| **and** | : | |
| **THE CITY OF CLAYTON, OHIO in its role of** | : | |
| **employer and manager of Northmont school** | : | |
| **police officers,** | : | |
| **DEFENDANTS.** | : | |

1

## COMPLAINT

1.     This action is brought by Dwain Stanford and Sharon Stanford on behalf of themselves and their minor children, John Doe and Jane Doe.  For years the Stanfords have pleaded with the Defendants to cease the racially motivated unfair discipline meted out by Defendant James Chad Kaltenbach, Northmont City Schools employees, and Clayton police officers assigned to Northmont schools.  Faced with the Defendants' continued malfeasance, the Plaintiffs apply to this Court for relief.

2.     The Stanfords allege violations of their constitutional and statutory rights and seek civil remedy allowed by 42 U.S.C. §1983. "There can be no doubt that claims brought pursuant to §1983 sound in tort.  Just as common law tort actions provide redress for interference with protected personal or property interests, §1983 provides relief for invasions of rights protected under federal law." City of Monterey v. Del Monte Dunes at Monterey, Ltd., 526 U.S. 687, 119 S. Ct. 1624 (1999).

3.     Consistent with the remedial provisions of 42 U.S.C. §1983 and 42 U.S.C. §2000, they apply to this Court for relief which includes general and special compensatory damages, punitive damages, and costs including reasonable attorney fees.

## JURISDICTION AND VENUE

4.     Subject matter jurisdiction exists under 28 U.S.C. §§ 1331 and 1343 because this action seeks to redress the deprivation, under color of state law, of rights secured by the United States Constitution.

5.     Venue is proper in the Southern District of Ohio under 28 U.S.C. § 1391(b)(1) and (2) because each of the Defendants resides in the district and because a substantial part of the events or omissions giving rise to the claims occurred in the district.

2

6.    This Court has personal jurisdiction over Defendants because they are domiciled in Ohio and because the acts and omissions which give rise to this complaint occurred in Ohio.

7.    Plaintiffs request that this court consider and adjudicate their state court claims against the Defendants. The judiciary's right to assert pendent jurisdiction exists whenever there is a claim arising under the constitution, the laws of the United States, and treaties made, or which shall be made under their authority, and the relationship between that claim and the state claim permits conclusion that the entire action before the court comprises but one constitutional "case". U.S.C.A.Const. art. 3, § 2. *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966).

8.    For a federal court to retain jurisdiction of state law claims under the pendent jurisdiction doctrine, the federal claim must have substance sufficient to confer subject matter jurisdiction on the court; the state and federal claims must derive from a common nucleus of operative fact. If, considered without regard for their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is power in federal courts to hear the whole. U.S.C.A.Const. art. 3, § 2. *Id.*

9.    Federal courts should consider and weigh in each case, and at every stage of litigation, values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendent state-law claims; when the balance of these factors indicates that a case properly belongs in state court, the federal court should decline exercise of jurisdiction by dismissing case without prejudice. *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 108 S. Ct. 614, 98 L. Ed. 2d 720 (1988).

**PARTIES**

3

10.  Plaintiff Dwain Stanford is husband to Sharon Stanford and father of John Doe and Jane Doe. Mr. Stanford is retired from active duty in the Air Force and employed as a civil servant at Wright-Patterson Air Force Base, Ohio.

11.  Plaintiff Sharon Stanford is wife to Dwain Stanford and mother of John Doe and Jane Doe. Mrs. Stanford is a veteran of active duty and a member of the Air Force Reserves. She is employed as a civil servant at Wright-Patterson Air Force Base, Ohio.

12.  Plaintiff John Doe is the minor son of Dwain Stanford and Sharon Stanford. He was enrolled at Northmont City Schools from 2009 to March 2019.

13.  Plaintiff Jane Doe is the minor daughter of Dwain Stanford and Sharon Stanford. She was at all relevant times described herein enrolled at Northmont City Schools.

14.  Jane Doe and John Doe are no longer enrolled at Northmont.

15.  Defendant Northmont City Schools is a public school district with offices at 4001 Old Salem Road, Dayton, Ohio, 45322.

16.  Defendant James Chad Kaltenbach, also known as James Kaltenbach, also known as Chad Kaltenbach, is a Vice Principal at Northmont High School. He is a person within the meaning of 42 U.S.C. § 1983 and has acted under color of state law in his capacity as Vice Principal.

17.  Defendant Tony Thomas is Superintendent of Northmont City Schools. He is a person within the meaning of 42 U.S.C. § 1983 and has acted under color of state law at all times relevant to this Complaint.

18.  Defendant Linda Blum is a 20-year member of the Board of Education of Northmont City Schools. She is a person within the meaning of 42 U.S.C. § 1983 and has acted under color of state law at all times relevant to this Complaint.

19.  Defendant Michael W. Barrow, M.D. is a physician who has served as Medical Consultant to Northmont City Schools and personal physician to Defendant Linda Blum. He is a

4

person within the meaning of 42 U.S.C. § 1983 and has acted under color of state law at all times relevant to this Complaint.

## FACTS

20.     Dwain Stanford and Sharon Stanford met and married while serving in our military.  In 2013 they moved to Dayton, Ohio, settling in the Northmont City Schools district. When they came to Northmont, the Stanfords' bi-racial children were among the few racial minorities in the district.

21.     Within a few years, the Stanfords noticed that the school district was becoming more racially diverse.  When they first arrived in Dayton, Dwain and Sharon's children were among the only ethnic minorities.  The student body is now approximately 1/3 racial minority.

22.     Despite comprising no more than 35% of the district, minority students at Northmont receive around 70% of out-of-school suspensions and approximately 75% of expulsions.  The experience of the Stanford children is representative of Northmont's racist response to its rapidly integrating district.

23.     In May 2014, the then-4th grade John Doe's things went missing from his desk at least twice.  And at least twice, his school supplies were found in the janitor's closet.  The day shift janitor told Dwain Stanford that he attributed this conduct to the night shift janitor and would refer the matter to school administration.  Northwood Elementary staff Rae Treherne, Faith Barrett, and Monica Richardson were apprised of this situation via e-mail.  Around that time, John Doe began to receive punishment not commensurate with those of his peers.  Weeks of recess were taken away for minor infractions.  Certain boys weren't allowed to play basketball.

24.     By Spring 2015, Northmont's mistreatment of the Stanford children escalated into physical abuse.  That March, lunch aide Traci Schommer grabbed Jane Doe, who was in the 6th grade, leaving a large dark bruise spanning the child's upper arm.  When she reported her injury to the nurse, Traci Schommer ridiculed her in front of peers and reprimanded her for making the

5

report.  Northmont did not notify the Stanfords about the injury.  After the Stanfords learned of the injury and began pursuing the matter, a school resource officer not involved in the incident took special note of the Stanfords.

25.     Officer Tom Hamlin is thought to be an associate of Traci Schommer.  He is a police officer with a regular presence at Northmont.  The Stanfords will testify that Officer Hamlin began parking his cruiser in front of their home, banging on the door when the parents were away, and, in one incident in which he caught the Stanford parents at home, requested to escort Jane Doe to school in his police car.

26.     Sharon Stanford remained hopeful that each new school year would restore in her children the love of school that she enjoyed as a child.  She told them not to be disruptive, and to at least initially defer to authority figures.  She is a model civil servant, soldier, wife, and mother, and together the Stanfords have seven children.  For a while, Northmont's aggressions seemed survivable.

27.     In 2016, the Stanfords were surprised to receive a summons from the local juvenile court.  A Northmont resource officer, Officer Randy Monnin, filed charges alleging that John Doe had engaged in unlawful disorderly conduct.  His purported offense?  Looking like he was contemplating running near the busses.  Not running near the busses; looking as though he were about to.

28.     Review of footage showed that John Doe did not behave inappropriately and that Officer Monnin was nowhere near the child and could not have observed him.  The charges were dismissed.  However, John Doe, who started on a city-wide select basketball team comprised of older children, was cut from Northmont's program.

29.     (This wouldn't be the last time that video footage would exonerate a Stanford child.  Jane Doe was once disciplined for leaving class and spending, according to a teacher, "half the class" period in the bathroom.  Video showed that she was gone for five minutes.)

6

30.     In the course of understanding the criminal charges against his son, Dwain Stanford consulted the Clayton Police Department and observed that the department maintained a file, with an identifying photograph, of John Doe. He requested a copy of the file and received a partial version of the document he saw at the police department.

31.     After the charges against John Doe were dismissed, Dwain Stanford e-mailed Northmont middle school principal Bill Mengerink and advised him that Officer Monnin was continuing to target and harass John Doe. Mr. Mengerink told Dwain that he would discuss the matter with Officer Monnin.

32.     After Dwain complained about Officer Monnin's treatment of John Doe, Monnin encountered John Doe ostensibly by chance at a local eatery. Officer Monnin barred the door of the restaurant entry to trap John Doe in the vestibule. John Doe reported the incident to his father who asked Officer Monnin about it. Initially, Officer Monnin denied harassing the boy. But when he realized that Dwain had witnessed the incident, he admitted to the encounter.

33.     By 2018, Jane Doe was in high school. Like humans the world over, she was dealing with shyness about her body. Sharon Stanford noticed that her daughter's gym grade was suffering. Testimony and evidence will show that Jane Doe was being penalized for remaining in jeggings during gym class. The gym teacher, Michael Hagan, had a process of allowing *leggings* to be worn in class. But *jeggings*? That was a bridge too far.

34.     Sharon Stanford surmised, reasonably, that this matter could be resolved with adult awareness of a teenager's insecurity. She scheduled a conference with the Mr. Hagan and was surprised when Vice Principal Chad Kaltenbach attended the conference, was combative, and insisted that a doctor's note would be required before the Stanford daughter could wear jeggings during gym. Mr. Kaltenbach's involvement with the Lycra content of a teenage girl's gym apparel was the first but not last of his inappropriate and unlawful interactions with the bodies of the Stanford children.

7

35.    Sharon complied with Northmont's wishes and, in early fall 2018, procured a doctor's note on her daughter's behalf.  The note said that Jane Doe was working to build a healthy body image and ought to participate in gym class wearing whatever she chooses, so long as it doesn't pose a distraction or threat to safety.

36.    In an act of administrative overreach that strains comprehension, school board administrator Linda Blum provided the note to Northmont consulting physician Michael W. Barrow who wrote, on Northmont letterhead, a two-page, single-spaced treatise conveying his view that the letter was forged and that a review of Jane Doe's entire medical record was necessary in order for him to make an informed medical opinion about her gym attire.  Thereafter, school administrators made a point of stopping by Jane Doe's class and making a note of what she was wearing.  This treatment eventually caused the Stanford daughter to leave school and suffer anxiety, weight loss, body image issues and other damage.

37.    Meanwhile, John Doe's mistreatment by Northmont continued.  As 2018 unfolded, he continued to receive disproportionate out of school sanctions for minor infractions, while white students received more forgiving treatment.  John Doe, then a freshman weighing under 150 pounds, was attacked by four Caucasian senior boys who attempted to drag him into the bathroom (and beyond the reach of Northmont's cameras).  Vice Principal James Chad Kaltenbach declined to punish them.  Dwain Stanford intervened and one of the students was suspended for a few days.  The Stanfords asked for another administrator to be assigned to oversee their son.  Northmont denied the request.

38.    In 2017, John Doe, then in the 8th grade,  asked his parents if he could transfer from Northmont.  He told his parents of curriculum known as 'slavery day', by which a white teacher herded students into a Northmont classroom, where the teacher played the role of slave master and assigned children to play either slave or overseer.  The 'slaves', including African American and bi-racial children, were compelled to perform humiliating tasks.  Slavery was

8

likened to a game of "Simon Says", and Dwain's efforts to convince Northmont to overhaul its curriculum were rebuffed by Co-Defendant Tony Thomas.

39.     On February 19, 2019, John Doe and three other minority Northmont High School students arrived late to school. Vice Principal James Chad Kaltenbach testified in John Doe's suspension appeal hearing that he received word from an employee (though this account would change) that the boys smelled like marijuana. Mr. Kaltenbach testified that he immediately drafted a suspension notice letter and retrieved John Doe from class. He commenced a search that included a search of the boy's pockets, bag, and removal of his shoes.

40.     Vice Principal Kaltenbach grabbed John Doe's right wrist and smelled it. He did not detect the odor of marijuana. He grabbed the child's left wrist and claims to have detected the smell of marijuana. He summoned school resource officers, including Officer Hamlin, and asked them to confirm the smell of marijuana on the child's hand.  They complied.

41.     John Doe was suspended for eleven days, a day longer than the ten-day maximum allowed by Ohio Revised Code Section 3313.66(c). John Doe and his parents appealed the suspension decision to Northmont.  On March 4, 2019, Northmont official Amy Sipes conducted a so-called suspension hearing, wherein she declined to hear any facts or data to show that non-white children are disproportionately punished by Northmont.  She also refused to hear about the harassment suffered by the Stanfords at the hands of Northmont.

42.     John Doe was due to return to school on March 6, 2019.  Northmont superintendent Tony Thomas had, before receiving the appeal decision, through counsel conveyed his intent to expel the boy.  On the afternoon of March 5, 2019, Amy Sipes issued her decision upholding J.S's suspension.  On March 31, 2019, a suspension appeal was filed with the Montgomery County Court of Common Pleas.  That day, a copy of the complaint was e-mailed to Northmont's counsel.  Formal service upon Northmont was made April 4, 2019.

9

43.     As of this writing, the administrative appeal of the suspension is being considered by the Honorable Gregory F. Singer of the civil division of the Montgomery County Court of Common Pleas.

44.     Dwain and Sharon Stanford have made the difficult decision to split up their household, renting an apartment in a neighboring school district where Dwain lives with John Doe and Jane Doe.  They have incurred significant expense, angst, physical and emotional stress, and lost earnings as they endeavor to protect their children.  Sharon Stanford is left tending the family's former home and raising her two youngest children, ages two and three, without the regular presence of their father and older siblings.

## CAUSES OF ACTION

## LIABILITY FOR DEPRIVATION OF RIGHTS UNDER 42 U.S.C. §1983

45.     To establish liability under § 1983 against state officials, a plaintiff must show that the officials, acting under color of state law, caused the deprivation of a federal right. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (citing *Monroe v. Pape*, 365 U.S. 167 (1961)). A § 1983 claim demands two allegations: (1) that a person deprived the plaintiff of a federal right, constitutional or statutory; and (2) that the person acted under color of state law when depriving the plaintiff of the federal right. *Gomez v. Toledo*, 446 U.S. 635, 640 (1980). If either element is missing, then a § 1983 claim has not been pleaded. *Christy v. Randlett*, 932 F.2d 502, 504 (6th Cir. 1991).

46.     When a § 1983 claim is alleged, the defense of qualified immunity is available to "government officials performing discretionary functions ... insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Whether a government official may be held liable for an allegedly unlawful action "generally turns on the objective reasonableness of the action, assessed in light of the legal rules that were clearly established at the time [that the action] was taken." *Veney v. Hogan*, 70 F.3d 917, 920 (6th Cir. 1995) (quoting

*Anderson v. Creighton*, 483 U.S. 635, 639 (1987)). The determination of whether an official is entitled to qualified immunity is a question of law for the district court. *O'Brien v. City of Grand Rapids*, 23 F.3d 990 (6th Cir. 1994) (citing *Poe v. Haydon*, 853 F.2d 418 (1989)).

47.  Accordingly, the Plaintiffs must assert not just infringement of constitutional or statutory right, but that the Defendants would have reasonably understood that their conduct violated these rights. *Wilson v. City of Shaker Heights*, 2017 WL 5125528 (N.D. Ohio Nov. 2, 2017), aff'd, 741 F. App'x 312 (6th Cir. 2018) citing *Veney* at 921. This case involves the most fundamental rights of American citizenship—the right to access public education. Any law enforcement or education professional, indeed any functioning adult, would understand that the conduct detailed herein violated the plaintiffs' constitutional rights.

## FIRST CAUSE OF ACTION

### 42 U.S.C. §1983 liability for the unreasonable warrantless search of John Doe.

48.  The Fourth Amendment of the United States Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched." U.S. CONST. amend. IV.

49.  The Fourth Amendment, applied to the states via the Fourteenth Amendment, protects individuals against unreasonable searches and seizures by government officials. All warrantless searches are presumptively unreasonable. *Reynolds v. City of Anchorage*, 225 F.Supp.2d 754 (W.D. Ky. 2002); *Daughenbaugh v. City of Tiffin*, 150 F.3d 594, 603 (6th Cir.1998).

50.  The Supreme Court has identified exceptions to the warrant requirement. Those include: searches incident to a valid arrest, seizure of items in plain view, exigent circumstances, consent searches, vehicle searches, container searches, inventory searches, border searches,

searches at sea, administrative searches, and searches in which the special needs of law enforcement make the probable cause and warrant requirements impracticable." *U.S. v. Haddix*, 239 F.3d 766, 767 n. 2 (6th Cir.2001).

51.     The Fourth Amendment's prohibition on unreasonable searches and seizures applies to searches conducted by school officials. U.S.C.A. Const.Amend. 4. *New Jersey v. T.L.O.*, 469 U.S. 325, 105 S. Ct. 733, 83 L. Ed. 2d 720 (1985).

52.     In determining whether students possess marijuana, Northmont City Schools personnel undertake an unreliable, invasive, troubling process whereby a school employee isolates a child and intimately smells hair, clothing, and skin.  Such searches do not further a compelling government interest, are not supported by individualized suspicion, and are too intrusive to be considered reasonable.

53.     The Supreme Court of Ohio sets forth the framework for evaluating student searches in *State v. Polk*, 150 St.3d 29, 2017-Ohio-2735.  The Court found that the school policy of searching unattended book bags was limited to furthering the compelling government interest of protecting against attacks like those at Columbine, Sandy Hook, and Virginia Tech.  The governmental interest of keeping students from marijuana exposure is less compelling than the interest in avoiding mass murder.

54.     A search must ordinarily be based on individualized suspicion of wrongdoing. *Polk* citing *Chandler v. Miller,* 520 U.S. 315, 313, 117 S. Ct. 1295, 137 L.Ed.2d 513 (1997).  The search of John Doe was based upon a group of boys reportedly smelling like marijuana. Northmont's search of John Doe and others whose presence in a group gives rise to suspicion is therefore improper.

55.      Moreover, such searches, in which children are isolated, their cell phones taken away, compelled to remove their shoes, and their bodies are touched and intimately searched by school personnel, are not reasonable given the intrusiveness of their nature.  Even when

12

individual suspicion is lacking, "in limited circumstances, where the privacy interest implicated by the search are minimal and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion." (*Id.* Quoting *Skinner v. Ry. Labor Executives Assn.,* 489 U.S. 602, 619, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). The privacy implication in the search upheld under *Polk* (the search of a book back left of an empty school bus) is dramatically less invasive than the Northmont search protocol detailed above.

## SECOND CAUSE OF ACTION

**42 U.S.C. §1983 liability for violation by Linda Blum and Michael Barrow of Jane Doe's right to due process under the law.**

56.    Without the knowledge or consent of the Dwain Stanford or Sharon Stanford, Northmont School Board member Linda Blum provided to Dr. Michael Barrow the doctor's note excusing Jane Doe from changing for gym class.

57.    Co-Defendant Barrow penned a two-page opinion wherein he asserted, incorrectly, that the note was fake. He also claimed that a full review of Jane Doe's medical record was required before he could render a medical opinion about accommodating the request that she be excused from changing for gym.

58.    To establish a procedural due process violation, a plaintiff must establish a constitutionally protected property or liberty interest and show that the state deprived the plaintiff of such interest without appropriate procedures. U.S. Const. Amend. 14, § 1. *Doe v. Ohio State Univ.*, 239 F. Supp. 3d 1048 (S.D. Ohio 2017), on reconsideration in part, 323 F. Supp. 3d 962 (S.D. Ohio 2018).

59.    Ohio, having chosen to extend right of education, could not withdraw that right on grounds of misconduct absent fundamentally fair procedures to determine whether the

13

misconduct has occurred. U.S.C.A.Const. Amend. 14; R.C. Ohio §§ 3313.48, 3313.64, 3321.04; *Goss v. Lopez*, 419 U.S. 565, 95 S. Ct. 729, 42 L. Ed. 2d 725 (1975).

60.   No articulable process was furthered by Co-Defendant Barrow's speculation about the authenticity of the doctor's note.  He did not apply any scientific or medical principles, only speculated, wrongly, that Sharon Stanford forged the note allowing Jane Doe to dress comfortably for gym. There is no policy or rule recognizing Dr. Barrow as an expert on the authenticity of doctor's notes.

61.   As a result of this conduct, Jane Doe received a low grade in gym class.  She also withdrew from Northmont and suffered significant mental and physical distress.  Co-Defendants Barron and Blum deprived Jane Doe of her right to a public education without due process.

### THIRD CAUSE OF ACTION

**42 U.S.C. §1983 liability for Defendants Northmont and Kaltenbach deprivation of John Doe's right to due process under the law.**

62.   Vice Principal James Chad Kaltenbach suspended John Doe for possessing marijuana.  This conclusion was based on Vice Principal Kaltenbach's stated belief that John Doe's left hand smelled like marijuana.

63.   Excluding John Doe from the learning environment for eleven days (longer, if Superintendent Tony Thomas had his way) was not reasonably related to any legitimate objective. John Doe was not suspended for smelling like marijuana, he was suspended for possessing it.  No evidence or facts suggest that Vice Principal Kaltenbach has a unique or preternatural ability to detect tiny quantities of marijuana.

64.   Vice Principal Kaltenbach's curious declaration that "we've been taught to smell hands" cannot suffice as a reasonably or consistently applied procedure.  Indeed, upon information and belief, Vice Principal Kaltenbach tends to only detect invisible marijuana on minority schoolchildren.

14

## FOURTH CAUSE OF ACTION

**42 U.S.C. §1983 liability deprivation by the Co-Defendants of John Doe and Jane Doe's rights to equal protection under the law.**

65.     The Fourteenth Amendment to the United States Constitution provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."   When a state has undertaken to provide public education, it must do so on equal terms.   *Brown v. The Board of Education of Topeka, Kansas*, 347 U.S. 483 (1954).

66.     The Defendants' mistreatment of the Plaintiffs deprived them of their right to access public education on equal terms.  Upon information and belief, Kaltenbach levels disproportionately harsh punishments to minority students at Northmont.

67.     But his fixation with the Stanfords is without question.  Evidence and testimony will show that Vice Principal Kaltenbach's behavior toward the Stanfords was baselessly punitive.  By using his power to harass them, he also interfered the right of John and Jane Doe to access education on the same terms as their white counterparts.

## FIFTH CAUSE OF ACTION

68.     Title VI of the Civil Rights Act of 1964, as amended, provides that "[n]o person in the United States shall, on the ground of race...be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Private individuals may sue to enforce Section 601 of Title VI prohibiting discrimination in covered programs and activities and obtain both injunctive relief and damages. Civil Rights Act of 1964, § 601, 42 U.S.C.A. § 2000d. *Alexander v. Sandoval*, 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001).

69.     Public education entities are subject to this mandate.  *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 664 (2d Cir.2012) (citing 34 C.F.R. § 100.13(i) (2000)) (defining

"recipient" to include any public "agency, institution, or organization, or other entity...in any State, to whom Federal financial assistance is extended."). A "program or activity" under Title VI includes "a local educational agency..., system of vocational education, or other school system." 42 U.S.C. § 2000d–4a(2)(B). *Brooks v. Skinner*, 139 F.Supp.3d 869, 881 (S.D.Ohio 2015).

70.     In determining whether alleged harassment was so severe, pervasive, and objectively offensive that it could be said to have deprived plaintiffs of access to educational opportunities in violation of Title VI, courts look to the nature, frequency, and duration of the harassment, as well as its effect on the victim. Civil Rights Act of 1964 § 601, 42 U.S.C.A. § 2000d.  *Estate of Olsen v. Fairfield City School Dist. Bd. of Education*, 341 F.Supp.3d 793 (S.D.Ohio 2018).

71.     This complaint alleges false criminal charges against children, superintendent endorsement of curriculum known as "slavery day", and other troubling behavior.  Evidence will show that Northmont and its co-defendants discriminated against John and Jane Doe on the basis of their race.

## SIXTH CAUSE OF ACTION

**Defendant Northmont negligently failed to discover Vice Principal Kaltenbach's criminal history and charges.**

72.     While investigating this matter, Plaintiffs' counsel became aware that Vice Principal Kaltenbach is known at Northmont by his middle name, Chad.

73.     Vice Principal Kaltenbach's first name is James.  By searching websites available to the public, counsel learned that Vice Principal Kaltenbach, as James Kaltenbach, had been criminally charged and convicted for telecommunication harassment.  His most recent charges stemmed from the alleged Summer 2019 stalking and harassment of his former fiancée.

74.     On December 5, 2019, Vice Principal Kaltenbach pleaded guilty to disorderly conduct.

16

75. Vice Principal Kaltenbach had an affirmative duty to disclose his full criminal history to his employer and the Ohio Department of Education (ODE).

76. Vice Principal Kaltenbach did not report his criminal history or pending charges to Northmont or the ODE.

77. The Licensure Code of Professional Conduct for Ohio Educators (LCPOE) requires reporting of "conduct that substantially impairs an educator's ability to function professionally in his or her position or any conduct that is detrimental to the health, safety and welfare of students." Ohio Administrative Code Chapter 3301-73-21 details conduct unbecoming the teaching profession. Such conduct includes making a false or misleading statement, crimes or misconduct including the school community, and other crimes.

78. Northmont could have discovered Vice Principal Kaltenbach's crimes and his failure to disclose them if the district had performed even a basic Google search. By failing to discover Kaltenbach's alias and crimes, Northmont deviated from a duty of care owed to the Plaintiffs.

79. Had Northmont learned and acted upon Kaltenbach's deception, the Stanford children would have been spared unfair surveillance and harsh punishment administered by Kaltenbach.

**SEVENTH CAUSE OF ACTION**

**Defendants have unlawfully interfered with Sharon Stanford's right to familial love, support, and consort.**

80. A wife has a cause of action for damages for loss of consortium against a person who, either intentionally or negligently, injures her husband and thereby deprives her of the love, care and companionship of her husband; consortium consists of society, services, sexual relations,

17

and conjugal affection, which includes companionship, comfort, love and solace. *Karimian-Dominique v. Good Samaritan Hosp.*, 2019-Ohio-2750.

81.    To protect their school age children from Northmont's misconduct, Dwain Stanford leased an apartment in a neighboring school district. The family has incurred significant and recurring costs to establish that household. Additionally, Sharon Stanford is deprived throughout the week of her husband's companionship.

## EIGHTH CAUSE OF ACTION

**Defendants Northmont and the City of Clayton, Ohio are vicariously liable for the wrongful acts of employee co-defendants.**

82.    For an employer to be liable under the doctrine of respondeat superior, the tort of the employee must be committed within the scope of employment. *Auer v. Paliath*, 2014-Ohio-3632, 140 Ohio St. 3d 276, 17 N.E.3d 561.

83.    The wrongful acts of individual Defendants complained of herein occurred within the scope of their employment by Northmont City Schools. Most of these events happened at Northmont school buildings.

84.    The misconduct described in this Complaint occurred pursuant to the authority granted by Northmont to each Co-Defendant.

## NINTH CAUSE OF ACTION

**Michael Barrow negligently performed the duties of Medical Consultant when he wrongly asserted that Jane Doe's doctor's note was false and that a full review of her medical record was necessary.**

85.    To establish actionable negligence, one must show in addition to the existence of a duty, a breach of that duty and injury resulting proximately therefrom. *Flagstar Bank, F.S.B. v. Airline Union's Mortg. Co.* 2011-Ohio-1961, 128 Ohio St. 3d 529, 947 N.E.2d 672.

86.     Under Ohio law, "malpractice" occurs when a member of the medical profession
or attorney fails to: (1) treat a case professionally; (2) fulfill a duty implied into the employment
law; or (3) exercise the degree of skill or care exercised by members of the same profession
practicing in the same locality.  *Nat'l Union Fire Ins. Co. of Pittsburgh*, *PA v. Wuerth*, 540 F.
Supp. 2d 900 (S.D. Ohio 2007), 349 F. App'x 983 (6th Cir. 2009).

87.     Dr. Barrow's letter, addressed to Vice Principal Kaltenbach, was wholly beyond
the constraints of his duties as medical consultant.  Nothing about Dr. Barrow's medical training
and expertise renders him an expert in determining the authenticity of a doctor's note.  Indeed, Dr.
Barrow was wrong about the legitimacy of the note.

**TENTH CAUSE OF ACTION**

**Defendants Northmont and City of Clayton negligently supervised their respective**
**employees, resulting in the Plaintiffs' damages.**

88.     Ohio recognizes a claim for negligent supervision.  *Lutz v. Chitwood*, 337 B.R. 160
(S.D. Ohio 2005).  Elements of a negligent supervision claim under Ohio law are the same as
those of a negligent hiring or retention claim: (1) the existence of an employment relationship, (2)
employee's incompetence, (3) employer's actual or constructive knowledge of such incompetence,
(4) employer's act or omission causing plaintiff's injuries, and (5) employer's negligence in hiring
or retaining employee as the proximate cause of plaintiff's injuries.  *Id*

89.     Northmont City Schools was aware of its employees' behavior long before Dwain
Stanford complained to Superintendent Tony Thomas about slavery day.  The school district
negligently failed to respond to the first complaints about Vice Principal Kaltenbach's behavior
and failed to intervene as his aggression escalated.

90.     Similarly, the City of Clayton failed to appropriately respond to the Stanfords'
complaints about police officer interactions with their children.  Officer Monnin was not

19

sanctioned for bringing the meritless charges against John Doe. Members of the police department are thought to create and maintain files on children. If true, this practice is an alarming indication of the force's values and methods.

## ELEVENTH CAUSE OF ACTION

### Malicious prosecution of John Doe

91.     A malicious-prosecution claim has four elements: (1) that a criminal prosecution was initiated against the plaintiff and that the defendant made, influenced, or participated in the decision to prosecute; (2) that there was a lack of probable cause for the criminal prosecution; (3) that, as a consequence of a legal proceeding, the plaintiff suffered a deprivation of liberty apart from the initial seizure; and (4) that the criminal proceeding must have been resolved in the plaintiff's favor. U.S. Const. Amend. 4; 42 U.S.C. § 1983.

92.     All elements of a malicious prosecution claim are satisfied in this case. A criminal prosecution was initiated against John Doe by Officer Monnin. The charges against him were fabricated, and therefore lacked probable cause. John Doe and the Stanfords were hailed into a court, an obvious deprivation of liberty. And finally, the charges were resolved in John Doe's favor.

**WHEREFORE,** Plaintiffs respectfully request that this Court:

(a) Enter an order enjoining the defendant from continuing its bogus and unfairly applied "smell test" to determine whether students possess marijuana; and

(b) Award special and general compensatory damages Plaintiffs to recompense for injuries caused by the Defendants; and

(c) Award Plaintiffs such additional relief as justice may require, together with costs and punitive damages in this action.

Respectfully submitted,

*Christine Baker, Esq*

Christine Baker, Attorney for the Plaintiffs
2312 Far Hills Ave, Box 390
Dayton, Ohio 45419
Tel: (937) 212-9013
Fax: (937) 314-6093
christinebakerlaw@outlook.com

## CERTIFICATE OF SERVICE

I certify that on December 23, 2019, this civil complaint, jury demand, and request

for damages was filed with the United States District Court for the Southern District of Ohio,

Western Division at Dayton, via the Court's Electronic Case Filing System.

Respectfully submitted,

*Christine Baker, Esq*

Christine Baker, Attorney for the Plaintiffs
2312 Far Hills Ave, Box 390
Dayton, Ohio 45419
Tel: (937) 212-9013
Fax: (937) 314-6093
christinebakerlaw@outlook.com